IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEANNE PHILLIPS, Administratrix )
of the Estate of Mark Phillips, )
Deceased, )
　　　　　　　　　　　　　　　 )
　　　　Plaintiff, )
　　　　　　　　　　　　　　　 )
　　　　　　　　　vs. ) Civil Action No. 05-1502
　　　　　　　　　　　　　　　 )
NORTHWEST REGIONAL COMMUNICATIONS, )
DANIEL NUSSBAUM, DANIELLE TUSH, )
and BRIAN CRAIG, )
　　　　　　　　　　　　　　　 )
　　　　Defendants. )

## MEMORANDUM

Michael Michalski shot and killed his girlfriend, Gretchen Ferderbar, her new boyfriend, Mark Phillips, and her sister Linda at the Ferderbar residence in a suburb of Pittsburgh, Pennsylvania, on October 29, 2003. On February 22, 2005, Plaintiff Jeanne Phillips was appointed administratrix of her son's estate and subsequently filed suit in this Court, claiming that Michalski's former employer, Northwest Regional Communications, several of its employees, and others were negligent in allowing him to use Northwest databases to obtain unauthorized information about the victims. The actions of each Defendant ultimately denied Mark Phillips his due process and equal protection rights guaranteed by the United States Constitution. More than four years later, the remaining Defendants have filed a motion for summary judgment in their favor (Doc. No. 91); for the reasons discussed below, the motion is granted in its entirety.

## I.   **BACKGROUND**

### A.   Factual History[1]

During the three years of their relationship, Gretchen Ferderbar ("Ferderbar") and Michael Michalski ("Michalski") lived with his mother, with her parents, and in their own apartment, apparently depending on how smoothly their relationship was going at the time.  At the time of the events in question, Michalski was living with his mother in Shaler, Pennsylvania, and Ferderbar with her parents, less than two miles away from the Michalski residence.

Michalski had been employed since approximately November 2000 as a telecommunications dispatcher at Northwest Regional Communications ("NRC" or "Northwest"), a service agency which routed emergency calls to appropriate response agencies and provided access to confidential federal, state and local databases to law enforcement agencies in parts of Allegheny County, Pennsylvania.  Northwest was organized sometime in 1997 as a non-profit corporation by nine municipal governments under the Pennsylvania Intergovernmental Cooperation Act and was funded

---

[1] Unless otherwise noted, the facts presented in this section are undisputed by the parties and are drawn from the Concise Statement of Undisputed Material Facts of [NRC Defendants] in Support of Their Motion for Summary Judgment, Doc. No. 93; Plaintiff's Statement of Material Facts Precluding Summary Judgment, Doc. No. 101; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, Doc. No. 102; and Response of [NRC Defendants] to Plaintiff's Statement of Material Facts, Doc. No. 109.  Where the Court has quoted from the various depositions and other evidence, the citations were provided by the parties in their statements of fact and have been confirmed as to their accuracy by the Court but have not been included herein in the interest of brevity.

solely by those municipal governments and by 9-1-1 fees processed by Allegheny County. Employees of NRC were not considered employees of any municipality and did not receive the same employee benefits as employees of the participating municipalities or the County of Allegheny.[2]

The NRC Board of Directors, composed entirely of public officials drawn from each of the municipalities which used its services, appointed the officers of Northwest.   In October 2003, the Northwest Communications Director was Defendant Daniel Nussbaum ("Nussbaum") who had worked there since February 2003.   Nussbaum would frequently consult with the chairman of the Administrative/ Operations Committee of the NRC Board of Directors, Tobias Cordek ("Cordek") who worked as Town Manager of the Town of McCandless, and acted as Nussbaum's immediate supervisor.   Cordek's office and the NRC offices were located in the same building, along with the Town of McCandless Police Department.

All the telecommunications dispatchers and other employees of NRC reported directly or indirectly to Nussbaum.   Nussbaum's general duties included being in charge of the overall day-to-day operations of the 9-1-1 Call Center, assisted by the operations manager, Nancy Speicher ("Speicher.")   In the fall of 2003, NRC

---

[2]   Northwest ceased operations in the spring of 2005 at which time its functions were taken over by the County of Allegheny.  At no time prior to 2005 when the Northwest Center was absorbed into the other 911 services provided by the County were any of the individual Defendants employees of Allegheny County.  (Doc. No. 93, ¶ 14.)

employed between 15 and 17 full- and part-time dispatchers, three of whom were on duty at any given time.

Defendant Danielle Tush ("Tush") began working as a telecommunications dispatcher in 2001. Tush considered Michalski "a co-worker, a friendly acquaintance." She knew Ferderbar was Michalski's girlfriend because she would come to the NRC Call Center from time to time to deliver food while he was on duty and they were regularly in contact by telephone. Tush recalled numerous occasions when Michalski would raise his voice or slam the phone down when talking with Ferderbar; she described them as being verbally "at each other constantly," but she never witnessed any physical aggression between them. Tush testified at her deposition that she had seen photographs Michalski brought to NRC depicting Ferderbar and another woman nude and recounted his attempts to use the internet while at work to locate sex partners for himself and Ferderbar. Tush thought of Michalski as volatile, abusive and potentially violent based on videotapes he had shown at work and on his report to her that he had broken the windshield of someone's car. She further testified that Michalski would harass another dispatcher at the Call Center until he would "flip out," then Michalski would film his victim's reaction and refer to it as "hilarious." According to her deposition testimony, Tush did not socialize with Michalski or Ferderbar outside of work.

Defendant Brian Craig ("Craig") joined Northwest in 2002, also

as a dispatcher. Craig considered Ferderbar Michalski's girlfriend based on her visits to the Call Center and numerous telephone calls; he described their relationship as "rocky." He indicated that during repeated telephone calls with Ferderbar, Michalski would become angry, raise his voice, and abruptly hang up the phone, but explained, "It was sometimes hard to distinguish whether he (Michalski) was mad or if he was just talking like Mike did." Craig testified he had also seen the nude photographs and thought Michalski "got a kick" out of abusing others based on his reports of confrontations with prostitutes and homeless people. Like Tush, Craig denied having any social interaction with Michalski or Ferderbar outside of work.

Nussbaum generally worked a Monday through Friday day shift while Michalski usually worked nights and weekends. Nussbaum did not socialize with either Michalski or Ferderbar except for an occasional lunch while at the Center and testified he knew no details about their relationship.

As an emergency call service agency, NRC maintained several databases which contained a wide range of information about individuals in the areas it served. One of the databases, called Commonwealth Law Enforcement Assistance Network or "CLEAN," was administered by Pennsylvania law enforcement agencies. Another was NCIC, administered and run by the Federal Bureau of Investigation and other federal law enforcement agencies. Together, these

databases provided information such as a person's name, date of birth, social security number, driver's license information, motor vehicle registration information, and criminal history.  The NRC computer system also provided maps of the area to supplement wall maps and hand-held maps such as those published by Rand-McNally. NRC had established policies to protect the confidentiality of information obtained from the Center's databases as well as procedures for reporting improper access or use of confidential information from the databases.

The telephone system at NRC allowed a dispatcher to immediately learn the telephone number of the caller and, if the call was made from a land-line, the location of the telephone and the individual to whom the line was registered.  It was Nussbaum's policy that if NRC staff were not otherwise occupied with emergency services, they were allowed to provide information to any one who called seeking directions to a certain address.  Nussbaum explained that he regarded providing such non-confidential information as a service to the public, on the theory that callers could "get the same information if they went to a Walmart or a gas station and got a map."  In fact, a training manual, prepared in May 2002 and in use at the time of the events discussed herein, specifically directed NRC dispatchers to give such assistance to callers.  (See Doc. No. 94, Exh. G, Nussbaum Declaration, Exh. 40, page from NRC training manual dated May 20, 2002.)  There was some disagreement

6

among the staff on the appropriateness of providing this information. For instance, Lori Tedesco ("Tedesco") testified that as a dispatcher, she understood that her role was to handle 9-1-1 emergency phone calls and serve as a link between the public and emergency service agencies; she believed giving directions was not appropriate.[3]

As noted above, Ferderbar and Michalski had been involved in a "rocky," off-and-on relationship for about three years as of late 2003. Sometime in September 2003, Michalski bought a Pontiac Grand Am automobile for Ferderbar's use. The vehicle was jointly owned, but Michalski made the monthly car payments because Ferderbar did not have sufficient income to do so.

In October 2003, Michalski began to suspect that Ferderbar might be dating another man. While at work on Sunday, October, 12, 2003, Michalski ran an unauthorized search on the CLEAN database to get the vehicle identification number ("VIN") of all vehicles registered to himself. At his deposition, he testified he wanted the VIN so that if he found out Ferderbar was seeing someone else, he could get a spare key made for the car and take it back. When Michalski performed the unauthorized search, he accidentally sent the inquiry to a number of police departments and other agencies. Tedesco, who was working the same shift, testified she received a

---

[3]  Similarly, Kevin Hogan testified that a late night request for directions to a certain address would be suspicious; he would not give directions over the telephone under those circumstances but would direct the caller to a law enforcement agency. (Doc. No. 101, ¶ 89.)

telephone call from the Pennsylvania State Police in Harrisburg, indicating that a query originating at NRC had been improperly submitted. When Tedesco questioned Michalski about it, he told her he had run information about himself through the CLEAN and NCIC databases in an attempt to get the VIN of the car he and Ferderbar had jointly purchased. When she reminded him this was a violation of NRC, CLEAN and NCIC policies, Michalski "just laughed."

The next day, Nussbaum learned of the unauthorized search either directly from Tedesco or from Speicher to whom Tedesco had reported the events. Nussbaum met with Michalski on October 15, 2003, to reprimand him for this activity, which Michalski knew from prior training was a breach of confidentiality and of general NRC policies. Nussbaum testified that when he asked Michalski why he needed to get the VIN from the databases when he could have gotten it easily from the car itself, Michalski refused to answer. In a memorandum dated October 16, 2003, Michalski was officially put on suspension for this offense for the period October 27 through November 2, 2003. However, the suspension did not begin as scheduled, apparently because Nussbaum could not find anyone to take over Michalski's scheduled work time on such short notice. Despite Michalski's violation, Nussbaum did not monitor or limit his subsequent access to the NRC confidential databases. Because suspensions were an unusual occurrence at Northwest, the other dispatchers -- including Tush and Craig - quickly became aware of

the situation.

Tedesco worked the same shift as Michalski on Sunday, October 19, 2003.[4]  During the shift, Michalski asked her, "Do you see this blood all over my pants?  I found that guy that Gretchen has been going out with last night and I beat him up."  According to Tedesco, there was a visible amount of fresh blood on his pants. Michalski later testified that the previous evening, he and Mark Phillips ("Phillips") had been involved in a fight at a nightclub. This was the first time the two had met and Michalski was not sure at the time if Phillips was Ferderbar's new boyfriend.  Tush and Craig were aware of the physical altercation between Michalski and another person, either because they were told by Michalski or heard about it from other dispatchers.  According to Tedesco, Nussbaum was also at the Call Center during this shift.

On Sunday, October 26, 2003, Michalski ran another unauthorized inquiry on a database at the Center, using Phillips's license plate number in an attempt to learn his home address.[5]  He later testified that he wanted this information because he thought

---

[4]  There is some dispute about whether Tedesco and Michalski worked together on Sunday, October 19, or Sunday, October 26.  (Compare Doc. No. 101, ¶ 60, and Doc. No. 109, ¶ 60.)  The Court has assumed for narrative purposes that the events discussed in this portion of the factual history occurred on October 19, some ten days before the shootings, because Defendants have presented evidence that on October 26, Tedesco (then Lori Martin) was not working the same shift as Michalski and other people mentioned in her testimony regarding the events which occurred that day.

[5]  At his deposition, Michalski stated he could not recall how he got Phillips's license plate number.

Ferderbar would try to hide the car from him at Phillips's home. Michalski knew that the inquiry was a violation of NRC policy and knew from the October 16, 2003 memorandum that another infraction would result in his dismissal. According to Tush, Craig and Nussbaum, none of them knew about this second unauthorized search until after the shootings three days later.

Despite the fact that he was supposed to be on suspension, Michalski worked the 7:00 a.m. to 3:00 p.m. shift at the Center on Tuesday, October 28, along with Tedesco. During that shift, Tedesco became aware of a violent telephone call between Michalski and Ferderbar which ended with him throwing his cellphone. He also went into the parking lot where he screamed so loudly at Ferderbar that he could be heard by 9-1-1 callers. When Michalski was not arguing with Ferderbar, he refused to take any 9-1-1 calls and just sat "with a blank stare." Tedesco testified that Nussbaum was present during this shift and could not have been unaware of the ongoing dispute. At some point, she went into Nussbaum's office to tell him Michalski was not taking calls and described his violent demeanor. Nussbaum refused to take any action, simply stating, "Well, he is having a bad day."

The same evening, NRC employees, including Craig, held a party at a local restaurant to celebrate a co-worker's completion of his master's degree. Michalski and Ferderbar arrived a few minutes late, but another attendee described their behavior that evening as

"very friendly;" they were touching, leaning together, laughing, and shared a plate of food in sharp contrast to their behavior earlier that day.  They left somewhat before other members of the group, apparently in separate cars.  Michalski later testified that after he and Ferderbar left the restaurant, they got into an argument, probably about her relationship with Phillips.

Just before 9:00 p.m. that evening, while getting ready to go out with a group of male friends, Michalski called a non-emergency but recorded line at NRC from his cellphone and spoke to Tush who was on duty.  Due to some type of electrical malfunction, the call was repeatedly dropped, but it was apparent that Michalski asked Tush for directions to 633 Edward Drive in Carnegie, Pennsylvania. Tush had difficulty using the computer-aided dispatch map, but was able to get a paper copy of a Rand-McNally map and gave Michalski the requested information.  Michalski refused to explain when Tush asked him why he wanted the driving directions and told her "not to worry" about it.  According to Tush's deposition, by the end of the conversation, she believed Michalski was about to commit some type of vandalism or other "criminal mischief," and commented to him that she might just have "aided and abetted a felony."  Tush later testified that at no time prior to the shootings the following afternoon did she know that Ferderbar was seeing someone else or that 633 Edward Drive was the address of that person, but she did concede that she was aware at the time that giving directions to

11

Michalski might have allowed him to do something illegal.

After the telephone call to Tush, Michalski went to a nightclub with his friends as planned. In the meantime, Phillips and Ferderbar had accepted his mother's invitation for them to join her at a casino in West Virginia, about a 50-minute drive from their home in Carnegie. After spending the evening at the casino, Phillips and Ferderbar drove back to his home, arriving there sometime in the early morning of October 29, 2003. Ferderbar parked her car at the Phillips residence.

Shortly after two o'clock that morning, Michalski again called the NRC from his cellphone, this time speaking on a recorded, non-emergency line with Brian Craig. Michalski asked Craig for directions to 633 Edward Drive and told him to use the Rand-McNally map Tush had used before. When asked why he wanted the directions, Michalski was evasive, saying only that he could not explain on a recorded telephone line. Craig asked Michalski to call him on his own cellphone and, using the map, gave him directions to 633 Edward Drive. Michalski also asked for the telephone number at that address, but Craig refused to give it to him. Like Tush, Craig later testified that at the time of this conversation, he was unaware of Phillips's existence, his relationship with Ferderbar, or that 633 Edward Drive was Phillips's address.

According to the transcripts of the calls, at no time during the conversations with either Tush or Craig did Michalski mention

Phillips's name or the fact that he suspected Phillips was Ferderbar's new boyfriend.

Michalski testified at his deposition that when he called Craig, he was only about three streets away from the address and would have been able to get there without assistance. His only purpose at the time, he later testified, was to find the car driven by Ferderbar. He testified, "I just wanted the car. I was sick and tired of everything. I just wanted the car." Michalski succeeded in finding Ferderbar's car and was leaving the Phillips residence in it when Ferderbar called him on his cellphone, irate that he was taking the vehicle. Michalski drove the Pontiac to his mother's home in Shaler, about 14 miles from the Phillips residence, and went to bed. He later conceded that finding Ferderbar's car at Phillips's house confirmed his suspicions of a relationship between the two of them.

Sometime after Michalski took Ferderbar's car, Mrs. Phillips returned from West Virginia and agreed to allow Ferderbar to stay overnight since she had no transportation home. The next morning, Ferderbar called Michalski several times, complaining about him taking the car and other matters. She also called Nussbaum at the Center about 9:15 a.m. and told him Michalski had come to the Phillips house using information he must have gotten from the NRC computer system. Nussbaum asked for Phillips's address, his license plate number, and Ferderbar's telephone number. At that

time, Nussbaum testified, he was not aware of the relationship between Phillips and Ferderbar, nor did he associate this event with Michalski's previous database violation on October 12, 2003, which had resulted in his suspension.   After receiving the call from Ferderbar, Nussbaum called the Pennsylvania State Police to have them track down the license plate number and learn if a search for it had in fact been run on the NRC computer databases.   He did not receive any information from the State Police until after the shootings.

Sometime after 11:00 a.m., Ferderbar called Michalski and told him she had succeeded in getting him fired from his job at NRC. She and Phillips then met her father for lunch and afterwards drove to her home in Shaler.

After the call with Ferderbar about getting him fired, Michalski went to the Call Center to talk with Nussbaum.   He admitted running Phillips's license plate on the computer system to get the address at which he suspected he might find the car he co-owned with Ferderbar.   Nussbaum told Michalski he had no choice but to let him go because of this second confidentiality infraction, but agreed to allow him to resign instead of being fired. Michalski told Nussbaum that "his life was over."   At the time of this conversation, Nussbaum testified, he was not aware of the Michalski's conversations the previous evening with Tush and Craig, nor did he believe at the time that Michalski was going to hurt

anyone.

When Michalski left the NRC Center, he withdrew $600 from his bank account and purchased a pistol, ammunition, and handcuffs. After "just driving around" for a while, he had a brief conversation with Ferderbar on his cellphone while driving to her home. When he arrived, sometime before 2:54 p.m., he found Ferderbar, her sister, and Phillips there; he shot all three of them. Phillips and Ferderbar died on the scene.[6]

Meanwhile, after the conversation with Michalski, Nussbaum tried to call Ferderbar on her cellphone; when she did not answer, he left a message stating that he had fired Michalski who was very upset. He also sent an e-mail to other NRC personnel indicating that Michalski had resigned effectively immediately. About 2:45 p.m., NRC employees told Nussbaum that Michalski was calling the dispatchers, blaming Ferderbar for his termination. Nussbaum again tried, at least once and perhaps twice, to call Ferderbar to warn her about the situation. When she did not answer her phone, he contacted the McCandless police department. Although he did not know where Ferderbar lived, he did know where she worked, and asked the police to go there. He also went to talk with McCandless Town Manager Cordek who happened to be meeting with the McCandless police chief at the time. While he was informing them about the

---

[6]   Linda Ferderbar died on November 3, 2003. Michalski later pled guilty to three counts of first-degree murder and one count of burglary; he is currently serving three consecutive life sentences.

situation, Speicher interrupted the meeting and told them there had been a shooting in Shaler, reportedly by Michalski.

Nussbaum was not aware that Phillips was among the shooting victims.  He called the Carnegie police department and asked them to go to Phillips's residence on Edward Drive because he understood from the telephone conversation with Ferderbar earlier in the day that she had been calling from that location.  The Carnegie police took Mrs. Phillips and her daughter into protective custody at their home.  Later that afternoon, they told Mrs. Phillips that her son had been killed.

B.   Procedural History

On October 27, 2005, Jeanne Phillips ("Plaintiff"), Mark Phillips's biological mother and administratrix of his estate, brought suit in this Court against Allegheny County, Allegheny County 9-1-1 (collectively, "the Allegheny Defendants"), Northwest, Nussbaum, Tush, Craig (collectively, "the Northwest Defendants"), and four other Call Center dispatchers. In a four-count complaint, Plaintiff alleged that Defendants' actions, individually and jointly, had deprived Phillips of his right to life and liberty without due process and violated his equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.  She further claimed their actions had resulted in Phillips's unreasonable seizure in violation of his rights under the Fourth Amendment to the United States Constitution, and brought

state-law claims for wrongful death and a survival action against all Defendants.

On May 15, 2006, in response to a motion to dismiss filed by the Northwest Defendants and the four other dispatchers,[7] this Court entered a memorandum opinion and order lifting a stay which had been imposed at the request of the Allegheny Defendants, dismissing with prejudice certain claims against the Northwest Defendants, and entering judgment in favor of all Defendants on the constitutional claims. The Court declined to exercise supplemental jurisdiction over the remaining state law claims and directed the Clerk of Court to transfer them to the Court of Common Pleas of Allegheny County. *See* Phillips v. County of Allegheny, CA No. 05-1502, 2006 U.S. Dist. LEXIS 29399 (W.D. Pa. May 15, 2006). Plaintiff immediately appealed and on February 5, 2008, the United States Court of Appeals for the Third Circuit reinstated a number of claims. *See* Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008). The Court of Appeals did affirm, however, this Court's dismissal of the constitutional claims against Northwest Defendants Leonard Deutsch, Ryan Ging, Susan Zurcher, and Philip Cestra. The case was remanded to allow Plaintiff to amend her state-created danger claims against Nussbaum and her equal protection claims

---

[7] The Allegheny Defendants did not file a motion to dismiss, reasoning that since the individual Defendants, at all relevant times, were employees of Northwest rather than the County of Allegheny, if their motion to dismiss were successful, there would be no basis for Plaintiff to continue pursuing her claims against the Allegheny Defendants.

against all remaining Defendants.[8]

Plaintiff filed an amended complaint on April 17, 2008, and again the remaining Northwest Defendants (NRC, Nussbaum, Tush and Craig) filed a motion to dismiss. The Court granted the motion insofar as it applied to the state-created danger claims against Northwest in Count I, the similar claims against Nussbaum in Count II, and the Fourth Amendment claims against all Northwest Defendants. See Phillips v. County of Allegheny, CA No 05-1502, 2008 U.S. Dist. LEXIS 49709 (W.D. Pa. June 25, 2008.)

Following unsuccessful mediation and extensive discovery, the Allegheny Defendants filed a motion for summary judgment on May 29, 2009. (Doc. No. 97.) Plaintiff did not oppose this motion (see Doc. No. 105), and judgment was entered in favor of those Defendants on July 6, 2009 (Doc. No. 106.)

The Northwest Defendants filed a similar motion on May 1, 2009, which Plaintiff did oppose. The parties have fully briefed the issues raised in Defendants' motion and the matter is now ripe for decision. At this juncture, the only remaining constitutional claims are the Fourteenth Amendment substantive due process claims against Defendants Tush and Craig, the Fourteenth Amendment equal

---

[8] The Court of Appeals reinstated the state-created danger claims against Defendants Tush and Craig, concluding that Plaintiff had sufficiently alleged such claims in the initial Complaint. However, it also concluded it would be futile to remand for the purpose of allowing Plaintiff to amend her state-created danger claims against Ging, Zurcher and Cestra (and, apparently, Deutsch), because she could not allege foreseeability, nor had she sufficiently alleged affirmative action on their parts. Phillips, 515 F.3d at 239, 243.

protection claims against NRC, Nussbaum, Tush and Craig, a state law claim for wrongful death, and a state-law survival action.

## II.  JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims brought under 42 U.S.C. § 1983 and over her pendent state law claims pursuant to 28 U.S.C. § 1367.  Venue is appropriate in this district inasmuch as the events giving rise to this suit occurred in this district.  28 U.S.C. § 1391(b)(2).

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* Startzell v. City of Philadelphia, 533 F.3d 183, 192 (3d Cir. 2008), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).  A "principal purpose[] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . .and it should be interpreted in a way that allows it to accomplish this purpose."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

In this case, as the moving party, Defendants bear the initial

burden of showing there is no genuine issue of material fact in dispute. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986). In order to satisfy this burden, Defendants need not "produce evidence showing the absence of a genuine issue of material fact;" instead they may simply point out "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325; <u>Allen v. Susquehanna Twp. Sch. Dist.</u>, No. 06-2481, 2007 U.S. App. LEXIS 9493, *5-*6 (3d Cir. Apr. 24, 2007). Mere factual disputes between the parties are insufficient to defeat an otherwise properly supported motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." <u>Liberty Lobby</u>, 477 U.S. at 247-248 (emphasis in original.) A fact is "material" if it may affect the outcome of the matter pursuant to the underlying law. <u>Id.</u> at 248; <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 4232 (3d Cir. 2006). In deciding if a dispute is "genuine," the court must avoid weighing the evidence or determining the truth of the matter, but consider only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Liberty Lobby</u>, <u>id.</u> at 248.

Once Defendants carry this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587, *quoting* Fed. R. Civ. P.

56(e).[9]  The burden on the nonmoving party is substantially heavier at this stage in that she must provide evidence to establish the existence of every element essential to her case, and for which she will bear the burden of proof at trial.  _Celotex_, 477 U.S. at 322; _Monroe v. Beard_, 536 F.3d 198, 206-207 (3d Cir. 2008).  To avoid summary judgment, a plaintiff may not speculate or rest on the allegations in the pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. _Ridgewood Bd. of Educ. v. N.E. for M.E._, 172 F.3d 238, 252 (3d Cir. 1999) (speculation and conclusory allegations do not satisfy the nonmovant's burden at this stage.)  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." _Liberty Lobby_, 477 U.S. at 257.  To meet its burden, the nonmoving party may use any type of evidentiary material "listed in Rule 56(c), except the mere pleadings themselves;" this material need not, however, be "in a form that would be admissible at trial." _Celotex_, 477 U.S. at 324. While Plaintiff need not prove her case, she must show that there is a genuine issue for trial; "some metaphysical doubt as to the material facts" or a "a scintilla of evidence" is not sufficient.

---

[9]  Fed. R. Civ. P. 56 (e)(2) states as follows: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

Matsushita, 475 U.S. at 586; McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424, 436-437 (3d. Cir. 2007) (the nonmoving party must "present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" for trial.)

In the past, the standard rule has been that in deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000), quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994); Startzell, 533 F.3d at 192. However, the Supreme Court of the United States has recently refined that standard, concluding that

> facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. . . .When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380 (2007).

That is, this court must determine "the relevant set of facts and draw[] all inferences in favor of the nonmoving party *to the extent supportable by the record*." Scott, id. at n.8 (emphasis in the original.)

**IV. ANALYSIS**

As Defendants correctly note in their brief in support of the motion for summary judgment, following the decision by the Court of

Appeals reported in <u>Phillips</u>, 515 F.3d 224, and this Court's subsequent decision on June 25, 2008, two constitutional claims remain.  We turn first to Plaintiff's claim that Defendants Tush and Craig violated Mark Phillips's right to substantive due process under the Fourteenth Amendment to the United States Constitution.

    A.   <u>Plaintiff's 'State-Created Danger' Claims</u>

       1.   *Plaintiff's Claims:*  In her Amended Complaint, Plaintiff alleges that the actions of Tush and Craig,[10] individually and/or jointly, resulted in a state-created danger where it was foreseeable that Phillips would suffer injury and harm.  Their actions were intentional and/or constituted willful disregard, gross recklessness and deliberate indifference for Phillips's personal safety, well-being, and right to life.  The relationship between these Defendants and Phillips was such that Tush and Craig "had direct knowledge of the likelihood that Phillips would suffer the harm he did."  As a result of their conduct, Tush and Craig "facilitated, enabled and created a dangerous situation and made Phillips particularly vulnerable to harm."  Therefore "Phillips was deprived of his right to life without Due Process as guaranteed by the Fourteenth Amendment." (Amended Complaint, Doc. No. 48 , "Am. Comp.," ¶¶ 48-57.)

---

[10]  The state-created danger claims against Tush and Craig have been unraveled from Count II of the Amended Complaint where they are interwoven with the constitutional equal protection claims.  As noted above, the state-created danger claims have been dismissed as they pertain to Nussbaum, Northwest, and the Allegheny Defendants.

According to Plaintiff, as noted above, both Tush and Craig were aware of the volatile relationship between Michalski and Ferderbar and of his suspension for having improperly accessed the CLEAN system on October 12 when he searched for the VIN of the car jointly owned by himself and Ferderbar.  Both testified they had never heard of Mark Phillips prior to the shootings, but knew Michalski claimed to have had a physical altercation on the weekend of October 18-19 with someone Ferderbar was seeing.  While knowledge forms part of the backdrop for the claims against Tush and Craig, Plaintiff's arguments now rest entirely on the assistance they gave Michalski at approximately 9:00 p.m. on October 28, 2003 (Tush), and at 2:15 a.m. on the morning of October 29, 2003 (Craig), when they provided driving directions to 633 Edward Drive, Phillips's residence.

      2.   *Applicable Law:*  A plaintiff alleging deprivation of a constitutional right by a state actor[11] pursues such a claim through the provisions of 42 U.S.C. § 1983.[12]  Section 1983 does not create substantive constitutional rights; rather it provides a vehicle for bringing claims that the plaintiff's federal

---

[11]  Plaintiff alleges and, for the purposes of deciding the summary judgment motion, Defendants assume, *arguendo*, that Defendants are "state actors" within the meaning of § 1983 jurisprudence.  (Defs.' Brief at 8, n. 1.)

[12]  Enacted as part of the Civil Rights Act of 1871, 42 U.S.C. § 1983 establishes a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights. 42 U.S.C. § 1988 sets forth the damages which may be awarded by the court to a prevailing party in a civil suit brought under § 1983.

constitutional or statutory rights have been violated.   Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

A defendant acts "under color of" state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West v. Atkins, 487 U.S. 42, 49 (1988) (internal quotation omitted); see also Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997).  The "rights, privileges or immunities secured by the Constitution" referred to in Section 1983 include those set out in the Due Process Clause of the Fourteenth Amendment which provides that "[n]o State shall. . .deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  As the Court of Appeals has pointed out, this provision protects an individual's liberty interest in personal bodily integrity, but "does not impose an affirmative obligation on the state to protect its citizens."  Phillips, 515 F.3d at 235, citing DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195-196 (1989).

> To state a claim under the Due Process Clause, a plaintiff must aver (1) some affirmative state action which violated plaintiff's Constitutional rights; (2) which the state was under some obligation to protect; (3) that the state failed to perform its obligation; and (4) some harm resulted.

Stolzer v. City of Philadelphia, CA No. 03-98, 2003 U.S. Dist. LEXIS 17773, *7-*8 (E.D. Pa. Sept. 30, 2003), citing County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).

Where an allegation of such a violation is made against multiple defendants, the plaintiff must establish direct liability on the part of each defendant separately. See Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to. . .§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")

Like other circuit courts of appeal,[13] the Third Circuit has established an exception to the general rule established in

---

[13] As of the date of this opinion, the United States Supreme Court has not formally recognized the state-created danger exception to the general rule established in DeShaney. See Walter v. Pike County, 544 F.3d 182, 191-192 (3d Cir. 2008). However, like the Third Circuit, this exception is recognized by several other courts of appeal. See, e.g., Matican v. City of New York, 524 F.3d 151, 157 (2d Cir. 2008); Waybright v. Frederick County, 528 F.3d 199, 207 (4th Cir. 2008); Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 534 (6th Cir. 2008); Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009); Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005); Morgan v. Gonzales, 495 F.3d 1084, 1092 (9th Cir. 2007); and Ruiz v. McDonnell, 299 F.3d 1173, 1182 (10th Cir. 2002) (referring to the "danger creation exception.") At least two other circuits have questioned this theory of state liability. See, e.g., Longoria v. Texas, 473 F.3d 586, 592, n.8 (5th Cir. 2006), reiterating that Court's decision in Rios v. City of Del Rio, 444 F.3d 417, 422-423 (5th Cir. 2006) which explicitly rejected the state-created danger theory, and Rivera v. Rhode Island, 402 F.3d 27, 35 (1st Cir. 2005), noting that the Court of Appeals had "discussed the state created danger theory, but never found it actionable on the facts alleged."

DeShaney that "the state does not owe its citizens an affirmative duty to protect them from harms caused by other private citizens," that is, the "state-created danger" theory. *See* Patrick v. Great Valley Sch. Dist., No. 06-4270, 2008 U.S. App. LEXIS 21340, *5 (3d Cir. Oct. 9, 2008). In Bright v. Westmoreland County, 443 F.3d 276 (3d Cir. 2006), the Court clarified the four elements of a meritorious state-created danger claim:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Id. at 281 (internal citations and quotation marks omitted).

The state-created danger test established by the Third Circuit is conjunctive; therefore, the failure to satisfy any one of the four criteria will result in dismissal of the claim.

3. *Defendants' Arguments for Summary Judgment*: Tush and Craig argue that at this point in the litigation, all the evidence supports their position that the danger to Phillips was not

foreseeable and his death was not the "fairly direct" result of their actions; that nothing they did would "shock the conscience;" and that no special relationship existed between either of them and Phillips.  (Brief of [Northwest Defendants] in Support of Their Motion for Summary Judgment, Doc. No. 92, "Defs.' Brief," at 10-24.)  Defendants first argue that Plaintiff has failed to establish an awareness on their part "that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  (Defs.' Brief at 10-11, *quoting* <u>Phillips</u>, 515 F.3d at 238.)  They contend that at the time they gave directions to Michalski, they did not know Ferderbar was seeing another man, who Mark Phillips was, that 633 Edward Drive was Phillips's address specifically or the address of Ferderbar's new boyfriend more generally, or that Ferderbar and Michalski were once again having a dispute.  When Michalski called the 9-1-1 Center, he refused to tell them why he wanted driving directions to the address, and when he asked Craig for the telephone number of the residence at 633 Edward Drive, Craig refused to provide it.  In short, the evidence shows that at the time they provided driving directions to Michalski, neither Defendant had knowledge pertaining to Phillips, nor was either of them aware that any danger (even to an unknown person) could result from giving Michalski that information.  Moreover, Phillips's death was not the "fairly direct" result of any act by Tush or Craig.  In

fact, the shooting occurred more than 12 hours later at a completely different location with which Michalski was already familiar, i.e., the Ferderbar home.  (Defs.' Brief at 12-13.)

As to the second element in the context of this case, under Third Circuit law, the proper question to ask is whether Tush or Craig intended to cause harm to Phillips.  Since they were unaware of his existence at the time they provided directions to Michalski, it is impossible to conclude that they intended him any harm. (Defs.' Brief at 14-17.)  With regard to the third element, there is no evidence of a relationship between either Defendant and Phillips individually or as a member of a distinct class.  (Id. at 17-18.)  And finally, nothing either Tush and Craig did created the danger to or increased the vulnerability of Mark Phillips.  (Id. at 18-24.)

4.  *Analysis and Conclusion:*   Plaintiff has not come forward with any evidence to contradict Defendants' contentions, arguing only that Tush and Craig could not have been unaware that Michalski was distraught over his breakup with Ferderbar, a point recognized by the Third Circuit in its earlier decision in this case.  Moreover, Defendants knew or should have known, given Michalski's  propensity for violence and the physical altercation him and Phillips, that the only reason to ask for directions to a specific address in the middle of the night was to cause harm to Ferderbar's new boyfriend.  Third, the proper standard to apply in

determining if their act of providing those directions "shocks the conscience" is not intent to harm Phillips, but rather deliberate indifference.   (Plaintiff's Brief in Opposition to Motion for Summary Judgment, Doc. No. 100, "Plf.'s Brief," at 21-23.)

Contrary to Plaintiff's arguments, we agree with Defendants that there is no evidence Phillips's death was a "fairly direct" result of the assistance they gave Michalski.   The evidence shows Michalski already had Phillips's address since he himself improperly accessed one of the Center's databases using Phillips's license plate number.   No harm came to Phillips at 633 Edward Drive when Michalski took Ferderbar's car.   Michalski denied having had any face-to-fact interaction with either Phillips or Ferderbar at the time.   (Def.'s Exhibits in Support of Motion for Summary Judgment, Doc. No. 94, Exh. B, Deposition of Michael Michalski at 74-75, 177-178, 182.)   This is corroborated by Mrs. Phillips's deposition testimony in which she stated that when she returned home that evening, her son told her he had heard a car in the driveway and looked out through the window to see Ferderbar's car being driven away.   (Id., Exh. D, at 21-22.)   The actual harm to Phillips came more than twelve hours later, *after* Ferderbar had called Michalski to tell him about her conversation with Nussbaum, *after* Nussbaum had fired Michalski for the second unauthorized use of NRC databases, and *after* Michalski purchased the gun used in the shootings.   In short, there is no evidence that Phillips was shot

as a fairly direct result of Tush and Craig giving Michalski driving directions to a location of which he was already aware.

Secondly, despite Plaintiff's arguments, no relationship existed between Phillips and either Defendant that would have made Phillips a foreseeable victim of Michalski or a member of a discrete class of persons subject to potential harm brought about by the actions of Tush or Craig.  Relying on allegations in the initial complaint, the Court of Appeals found that Phillips was a member of a discrete group subjected to harm by Defendants' actions; Tush and Craig were aware that Phillips was in a close personal relationship with Ferderbar; and Phillips was specifically contemplated in Michalski's threatened violence.  <u>Phillips</u>, 515 F.3d 242-243 (referring to allegations that Tush and Craig knew "they were accessing unauthorized personal information that had absolutely no relationship to their function as dispatchers;" were aware that Michalski was "distraught" over his break-up with Ferderbar; this "distress was the reason he accessed unauthorized information;" and that on the afternoon of October 29,[14] Michalski had told Tush and Craig about his termination, "that he had nothing left to live for and that Ferderbar and Phillips were going to pay for putting him in his present situation." (Complaint, ¶¶ 25, 26,

---

[14]  The Court of Appeals apparently failed to consider that this last statement was made long after Tush and Craig had given Michalski directions to the Phillips residence and therefore could not have been a factor in determining whether their actions the previous night had shocked the conscience.

40.)  However, following discovery, there is no evidence to support any of these allegations.  Thus Plaintiff has failed to establish any knowledge on the part of either Defendant which would have established a relationship between him/her and Phillips.

Nor is there any evidence of a "direct causal relationship between the affirmative act of the state and plaintiff's harm" which rendered Phillips "more vulnerable to danger than had the state not acted at all."  Phillips, id. at 281; see also Kaucher, 455 F.3d at 433 ("the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff.")  At the time Tush and Craig assisted Michalski, he already knew Phillips's identity and his address.  If his October 19, 2003 report to others at the Call Center about beating up Phillips is assumed to be true, he already suspected that Phillips was involved with Ferderbar.  Michalski testified that even if Tush or Craig had not provided directions, at the time he called Craig, he was only a few streets away and could have found the address without help.  Thus, providing driving directions to 633 Edward Drive did not increase the danger to Phillips because Michalski already had the necessary information to locate and, if he wished, confront him.  In short, nothing Tush and Craig did created an opportunity which would not otherwise have existed for Michalski to harm Phillips nor did their actions make him more vulnerable to the events which later occurred.  See D.R. v. Middle Bucks Area

32

Vocational Technical School, 972 F.2d 1364, 1374 (3d Cir. 1992) (affirming dismissal of state-created danger claim because defendants' actions did not create a danger, increase plaintiffs' risks of harm, or make them more vulnerable to assault.)

We conclude Plaintiff has failed to establish that Phillips's ultimate death was a fairly direct result of Tush or Craig providing Michalski with directions to his home, or that there was a relationship between either Defendant and Phillips which would have made him a foreseeable victim of Michalski as a result of them providing the information. We need not therefore address the parties' arguments regarding the degree of culpability nor Defendants' alternative arguments that Tush and Craig are entitled to qualified immunity. Summary judgment is therefore granted to those Defendants on Count I of the Amended Complaint.

B.   Plaintiff's Equal Protection Claims

1.   *Plaintiff's Claims:*   In the Amended Complaint, Plaintiff alleges that NRC, Nussbaum, Tush and Craig violated Phillips's constitutional rights to equal protection under the law. As it pertains to NRC, through its "deliberate and conscious indifference and utter disregard in the training and monitoring of [its] agents and employees," Northwest "fostered and created the atmosphere, custom, and practice whereby [Phillips's] personal, private information was not protected." (Am. Comp., Count I, ¶¶ 45-46.) With regard to Tush and Craig, this claim is based on

allegations that unlike other persons whose confidential information in the Call Center's databases was accessed only for legitimate purposes, those Defendants discriminated against Phillips because "they accessed his personal information to assist Michalski in his attempt to track and eventually kill him." (Id., Count II, ¶ 55.)  As for Nussbaum, Plaintiff alleges that despite knowing Michalski had violated NRC policy in making the unauthorized search for his own vehicle identification number, Nussbaum allowed Michalski to continue to have access to the Call Center's databases and to employees who could assist him in his improper searches, did not investigate Michalski's violations, and "made no effort to monitor or restrict Michalski's ability to access the databases." (Am. Comp., ¶ 15-16.)  These failures were exacerbated first after Michalski commented on October 19 to other dispatchers while Nussbaum was in the office that he had physically attacked someone he believed to be a rival for Ferderbar's attentions, and second after Tedesco told Nussbaum on October 28 that Michalski and Ferderbar were once again in the throes of a violent telephone argument.

     2. *Applicable Law*:  "Under the Fourteenth Amendment, no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" <u>Shuman v. Penn Manor School Dist.</u>, 422 F.3d 141, 151 (3d Cir. 2005), *quoting* U.S. CONST. amend. XIV, § 1. The equal protection clause is intended "to secure every person

within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (internal quotation omitted.)  As compared to a claim in which the plaintiff alleges he was discriminated against because he is a member of a protected class such as race, age or gender, <u>Olech</u> established that an equal protection claim may be brought by a plaintiff who claims, as a "class of one," that he was discriminated against by a state actor.  Based on its analysis of <u>Olech</u>, the Third Circuit Court of Appeals has held that "at the very least," a claim that the plaintiff's equal protection rights as a class of one have been violated requires allegations that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 239 (3d Cir. 2006).

     3.   *Defendants' Arguments for Summary Judgment*: Defendants argue, as discussed above, that there is no evidence to show NRC, Tush, Craig, or Nussbaum treated Phillips any differently than they would have any other member of the public.  There was no intentional discrimination against him and any arguments of negligent or disparate impact which might be raised by Plaintiff must fail under Third Circuit law.  Moreover, there is no evidence

that anyone helped Michalski get the confidential information about Phillips, nor evidence to establish proximate cause between the actions of any Defendant and the harm to Phillips.  To the extent that NRC, through Nussbaum, failed to take immediate action when Michalski violated NRC policies by accessing the databases for improper purposes, there were numerous intervening and superseding events between Nussbaum's failure to act or NRC's failure to train or monitor its employees or to protect Phillips's confidential information such that no proximate cause can be established with regard to those Defendants.  (Defs.' Brief at 24-28.)

     4.  *Analysis and Conclusion:* It is clear from the evidence that Tush, Craig and Nussbaum did not treat Phillips's personal information any differently than they did the personal information of others.  First, it was common practice, and in fact Nussbaum's policy, for dispatchers to assist individuals who called on non-emergency lines by providing driving directions to specific locations.  Craig, Tush, and Nussbaum all testified to that point. (*See*, in particular, Nussbaum's testimony at Doc. No. 94, Exh. F, Deposition of Daniel Nussbaum, at 62-77.)  While some dispatchers such as Tedesco and Ging later testified that they disagreed with this practice, the evidence is clear that it was the established policy of the Call Center at the time.   Therefore, by giving Michalski directions to 633 Edward Drive, Tush and Craig were treating the persons who lived at that address just as they would

the people who lived or worked at any other address about which a caller inquired.  Furthermore, when Michalski asked Craig for the telephone number at 633 Edward Drive, Craig refused to provide it, consistent with protecting that information for any other individual whose name and telephone number were in the databases.

Second, since Plaintiff has not established that Tush or Craig knew of Phillips's existence and/or Michalski's animus toward him (either by name or in general), neither Defendant can be said to have intended to help Michalski find him when they provided him with driving directions.  Thus, Plaintiff has failed to show that they intentionally treated him differently from any other person similarly situated.  Third, contrary to Plaintiff's allegations in the Amended Complaint, there is no evidence that Tush or Craig accessed NRC databases to provide confidential information about Phillips to Michalski.  Michalski admitted that he was the one who used NRC databases to learn Phillips's address from his vehicle license plate and when he asked for the telephone number at 633 Edward Drive, Craig refused to provide it.

As to the claims against Nussbaum, despite Plaintiff's arguments that Nussbaum "must have known" that Michalski had accessed NRC databases for an improper purpose on October 12, 2003, this argument is based only on speculation.  Nussbaum testified that he was somewhat mystified about why Michalski would use the databases to get the VIN for a car which was registered to him, but

37

he had no reason to believe Michalski had performed any searches which would have revealed another person's confidential information. It is further speculation that Nussbaum knew about the altercation with Phillips on October 18-19 simply because he happened to be at work that day; the evidence shows he had a separate office within the Call Center and there is no evidence of any exchange directly between him and Michalski that day. In fact, there is no evidence that Nussbaum was aware of Phillips's existence prior to the morning of October 29, 2003, when Ferderbar called him to complain that Michalski had used the Call Center's databases to get Phillips's home address.

Plaintiff argues that Nussbaum discriminated against Phillips in favor of Michalski "by failing to contact Phillips or law enforcement to report the violation by Michalski and the risk to Phillips." This argument is supported by Nussbaum's admission that had he suspected at the time of the first improper database search that Michalski was trying to gain access to another person's confidential data, he would have been concerned that the purpose of the search was to track that person or commit some criminal activity. (Doc. No. 94, Exh. F, at 137-139.) However, there is no evidence that Nussbaum would have contacted the police to report an unauthorized database search performed on any member of the public or would have contacted another individual who had been the subject of such a search. See <u>Young v. Twp of Coolbaugh</u>, No. 07-2341, 2008

U.S. App. LEXIS 9117, *6 (3d Cir. Apr. 25, 2008) (at the summary judgment stage, the plaintiff must produce evidence that others similarly situated to him were treated differently and may not simply allege the existence of those others.)

We conclude that the equal protection claims must fail and summary judgment entered in favor of the individual Defendants. Assuming for the sake of argument that NRC itself was, as Plaintiff alleges, a state-actor at all times acting through its agents and employees (*see* Am. Comp., ¶¶ 7, 11), it logically follows that because there has been no violation of equal protection rights by any of the individual Defendants in this matter, the claims against the corporate entity must also fail. *See* Hill, 455 F3d. at 245; Kaucher v. County of Bucks, CA No. 03-1679, 2005 U.S. Dist. LEXIS 1679, *26 (E.D. Pa. Feb. 7, 2005) ("the doctrine of *respondeat superior* does not apply in actions brought under section 1983"); and Iqbal, *supra*, stating that vicarious liability is inapplicable to § 1983 suits.

In addition, although we have carefully perused the section of Plaintiff's brief in opposition to the motion for summary judgment which addresses the equal protection claims (Plf.'s Brief at 9-19), we find no persuasive argument to support her allegation that NRC should be held liable because it had "an official pattern, practice or custom of permitting or tolerating" personal information in the Call Center's databases to be improperly

accessed and used. (Am. Comp., ¶¶ 46, 55.)[15]  The equal protection claim against NRC itself must, therefore, also be dismissed.

Before addressing the remaining state law claims, we pause to note that both Defendants and Plaintiff question the viability of Counts III and IV in light of the fact that they were dismissed without prejudice in the Court's initial decision after the constitutional claims were dismissed.  Plaintiff did not raise this dismissal in her arguments before the Third Circuit Court of Appeals which would usually mean that her recourse would be to raise them in a Pennsylvania state court.  However, out of an abundance of caution, both parties argue the merits of these claims in their summary judgment pleadings.

Usually, when a federal district court dismisses all of the claims over which it has primary jurisdiction, it has discretion to relinquish the supplemental jurisdiction it had over state law claims arising out of the same set of facts so that such claims may be addressed by the appropriate state court.  <u>Cindrich v. Fisher</u>, Nos. 06-2615 and 07-2969, 2009 U.S. App. LEXIS 15161, *18 (3d Cir. July 8, 2009).  "The decision should be based on considerations of judicial economy, convenience and fairness to the litigants."  <u>Id.</u>,

---

[15]  Plaintiff does argue that NRC "aided and abetted" Michalski in his efforts to track and kill Phillips (Plf.'s Brief at 16), but no policy or practice on the part of the Call Center itself is discussed.  She also refers to "the actions of NRC in continuing to allow Michalski access to NRC databases" and "failing to limit or monitor his activities" after his initial violation.  However, these allegations pertain to actions (or inactions) on the part of Nussbaum, not a policy or practice of the Center itself.

*citing* <u>New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.</u>, 101 F.3d 1492, 1505 (3d Cir. 1996), and <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726-27 (1966). In litigation such as this, where the matter has been before the same federal court for almost four years and where the Court is thoroughly conversant with the facts and history of the case, it seems clear that judicial economy would weigh in favor of this Court retaining jurisdiction to consider the two remaining state court claims. Neither party has argued that convenience or fairness to them as litigants would be impaired by continuing before this Court. We therefore turn to the remaining state law claims.

     C.  <u>Wrongful Death Action</u>

     1.  *Plaintiff's Claims:* In Count III of the Amended Complaint, Plaintiff brings a wrongful death action against Defendants NRC, Nussbaum, Tush and Craig, alleging that by virtue of their position, authority and knowledge, these Defendants had a duty to protect Phillips from harm. Their actions or failure to act constituted negligence or willful misconduct resulting in a breach of that duty. Because Phillips's death was a direct and proximate result of their negligence, Defendants are therefore liable to his next of kin for pecuniary losses and other damages recoverable under Pennsylvania's Wrongful Death Act, 42 Pa. C.S.A. § 8301. (Am. Comp., ¶¶ 58-62.)

2.   *Applicable Law:*   Under Pennsylvania state law, a wrongful death action and a survival action are closely related yet independent.   A wrongful death action may be brought by certain survivors of the decedent and is intended to compensate them for having been deprived of the decedent's lost earnings, services the decedent would have performed for the family, and special expenses provided for in the statute.   *See* Hodge v. Loveland, 690 A.2d 243, 245-246 (Pa. Super. Ct. 1997), and 42 Pa. C.S.A. § 8301(c).

A wrongful death action may be brought under Pennsylvania law "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime."   42 Pa. C.S. § 8301(a); *see also* Wood v. City of Lancaster, CA No. 06-3033, 2009 U.S. Dist. LEXIS 2123, *70 (E.D. Pa. January 13, 2009). As a parent of Mark Phillips, Jeanne Phillips is among those enumerated individuals who may bring such a claim.   42 Pa. C.S.A. § 8301(b).

"Liability for wrongful death requires a determination that a defendant's negligence caused the death."   Quinby v. Plumsteadville Family Practice, Inc., 970 A.2d 1061, 1077 (Pa. 2006).   Under Pennsylvania law, the elements of negligence are (1) the existence of a duty requiring a person to conform to a certain standard of conduct; (2) the defendant's breach of the duty or failure to

42

conform to the standard; (3) a causal connection between the breach of the duty and the resulting injury; and (4) actual loss or damage to the plaintiff. Atcovitz v. Gulph Mills Tennis Club, 812 A.2d 1218, 1222 (Pa. 2002). "It is well established that a cause of action in negligence requires allegations that establish the breach of a legally recognized duty or obligation that is causally connected to the damages suffered by the complainant." Bilt-Rite Contrs., Inc. v. Architectural Studio, 866 A.2d 270, 280 (Pa. 2005) (internal quotation omitted.) "Absent a breach of duty, a negligence claim cannot be sustained." Marshall v. Port Authority of Allegheny County, 568 A.2d 931, 935 (Pa. 1990). "The existence of a duty is a question of law for the court to decide." R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005) (citations omitted.)

        3.    *Defendants' Arguments for Summary Judgment:*
Defendants argue first that summary judgment should be granted in their favor on the wrongful death claim because they are entitled to statutory immunity under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S. ¶ 8501 ("Tort Claims Act"), inasmuch as Northwest is a "local agency" as that term is defined by the Tort Claims Act. Because Nussbaum, Tush and Craig were employees of a protected local agency, they are also entitled to statutory immunity because none of their actions constituted "willful misconduct." (Defs.' Brief at 40-45.) In addition, they argue, Plaintiff has failed to establish any of the elements of a wrongful

death claim against any of the NRC Defendants.  (<u>Id.</u> at 46-49.)

4.   *Analysis and Conclusion:*  With regard to a duty arising between any of the individual Defendants and Phillips, as discussed at length above, there is no evidence to show that either Tush or Craig was aware that Phillips was the person Michalski suspected of interfering with his relationship with Ferderbar nor that Phillips lived at 633 Edward Drive when they provided directions to that address.  In short, the parties were complete strangers to each other.  Tush and Craig therefore had no duty to Phillips which would differ from their duty to any other member of the general public.  Pennsylvania courts "have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances."  <u>Commerce Bank v. First Union Nat'l Bank</u>, 911 A.2d 133, 139 (Pa. Super. Ct. 2006).

If Michalski had asked Tush to find Phillips's address in one of the Call Center's databases for him or if Craig had provided Phillips's home telephone number to Michalski, they would have breached a duty to the general public to keep such information confidential, but those events did not occur.  The analysis with regard to Nussbaum is slightly different.  The evidence shows that he did not become aware of Phillips's existence and his relationship with Ferderbar and Michalski until the telephone call from Ferderbar on the morning of October 29.  Therefore, he knew

about the strained relationship between Ferderbar and Michalski, as well as Phillips's existence (if not his precise relationship with Ferderbar) when he fired Michalski later that day.  Knowing that Michalski was upset over his firing, however, Nussbaum immediately tried to reach Ferderbar by telephone to alert her to the situation and contacted the McCandless police department, rather than negligently ignoring the situation.  Plaintiff argues that Nussbaum was negligent in failing to try to reach Phillips at his home telephone number, but by the time Nussbaum fired Michalski and the situation had escalated, Phillips and Ferderbar had already left that address.  There is no evidence that Nussbaum knew Phillips's cellphone number or that he had Ferderbar's home telephone number and could have tried to reach her or Phillips at that number.

Finally, even if one were to conclude that a negligent action by any of these Defendants heightened Michalski's animus against Phillips, under Pennsylvania law, where the purported negligence is so remote that the actor cannot be held liable for the harm that subsequently occurred, there is a lack of proximate cause.  As the Pennsylvania Superior Court has stated, "It is not sufficient. . .that a negligent act may be viewed, in retrospect, to have been one of the happenings in the series of events leading up to an injury."  Brown v. Philadelphia College of Osteopathic Med., 760 A.2d 863, 868 (Pa. Super. Ct. 2000). Rather the court must determine as a matter of law whether the defendant's conduct was a

45

substantial factor in producing the harm by considering:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
>
> (c) lapse of time.

Brown, id. at 869, *quoting* Restatement (2d) of Torts, § 433 (1965).

Plaintiff has failed to establish that providing directions to an address Michalski already knew was the proximate cause of the injury to Phillips more than 12 hours later, at a different location, and after several intervening events, e.g., Ferderbar's telephone calls to Michalski on the morning of October 29, his firing, and his purchase of a handgun. Similarly, we cannot find that Nussbaum firing Michalski for inappropriately accessing the NRC's confidential databases was the proximate cause of Phillips's death even though that action may have been closer in time than the actions of the other Defendants.

We conclude that Plaintiff has failed to establish proximate cause between the act of any individual Defendant and Phillips's ultimate death.

Turning to the wrongful death claim as it pertains to NRC, the parties focus their arguments on the question of whether the Call Center was a "local agency" as that term is defined the Tort Claims

Act, and is therefore immune from negligence claims.  We need not resolve that question however, because we conclude that NRC, as the employer of Nussbaum, Tush, Craig, and Michalski, cannot be held liable for their actions.

Let us assume for sake of argument that NRC is not a local agency entitled to immunity under the Pennsylvania law.  In fact, Plaintiff describes NRC in the Amended Complaint merely as "a corporation established and operated as an emergency/911 call and dispatch center for the benefit of residents of the County of Allegheny."  (Am. Comp., ¶ 5.)  It is well-established that a corporation is a legal fiction which can act only through its officers, directors, employees, and other personnel.  Tayar v. Camelback Ski Corp., 957 A.2d 281, 289 (Pa. Super. Ct. 2008), citing Lokay v. Lehigh Valley Co-op. Farmers, Inc., 492 A.2d 405, 408-410 (Pa. Super. Ct. 1985).

The only explicit allegations against Northwest[16] are that its "conduct, . . .position and authority as [a] state actor[] facilitated, enabled and created a dangerous situation and made Phillips particularly vulnerable to harm" and that the "deliberate and conscious indifference and utter disregard in the training and monitoring of [its] agents and employees, fostered and created the atmosphere, custom and practice whereby an individual [sic], namely

---

[16]   These allegations were originally brought against the Allegheny Defendants as well who, as discussed above, have already been granted summary judgment.

Phillips' personal, private information, was not protected." (Am. Comp. ¶¶ 44-45.)   The employees who must be considered in this context include not only the three individual Defendants, but also Michalski.   It logically follows that since no negligence has been established on the part of Nussbaum, Tush or Craig, none can be attributed to their corporate employer.   However, we must also consider Michalski's act of violating the confidentiality of the NRC databases, and the allegation that he was allowed to do so because NRC failed to train and monitor its employees.

It is well-established that under the doctrine of *respondeat superior*, an employer may be held vicariously liable for the negligent acts of his employee which cause injury to a third party, provided those acts were committed "during the course of and within the scope of" his employment.   Brezenski v. World Truck Transfer, Inc., 755 A.2d 36, 39 (Pa. Super. Ct. 2000), *citing* Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979).   Under Pennsylvania law, the question of whether an employee was acting "during the course of and within the scope of employment" is usually reserved for the jury.   Walker v. Henkels & McCoy, CA No. 05-0963, 2006 U.S. Dist. LEXIS 91955, *9, n.9 (M.D. Pa. Dec. 20, 2006), citing Norton v. Ry. Express Agency, Inc., 412 F.2d 112, 114 (3d Cir. 1969).   However, if "no reasonable inference from the facts supports the finding that the employee was acting in furtherance of the employer's business, the issue may properly be

decided by the court." <u>Walker</u>, <u>id.</u> (internal quotation omitted.)
"The conduct of an employee is considered 'within the scope of
employment' for purposes of vicarious liability if: (1) it is of a
kind and nature that the employee is employed to perform; (2) it
occurs substantially within the authorized time and space limits;
[and] (3) it is actuated, at least in part, by a purpose to serve
the employer." <u>R.A. ex rel. N.A. v. First Church of Christ</u>, 748
A.2d 692, 699 (Pa. Super. Ct. 2000).[17]

NRC had established policies to maintain the confidentiality
of the information in the databases it used to provide emergency
services to its subscribers; in fact, each employee, including
Michalski, had signed a statement affirming that he understood the
necessity of maintaining that confidentiality and the consequences
of any violation. (<i>See</i> Doc. No. 94, Exh. J.) Thus, while Michalski
apparently accessed the databases on at least two separate
occasions "substantially within the authorized time and space
limits," of his employment, i.e., while he was on duty at the Call
Center, it cannot be said that doing so was an act "of a kind and
nature that [he was] employed to perform" nor was it "actuated, at

---

[17] We need not consider the fourth prong of the test set out in this
case which pertains to the use of force by an employee against a third
party for two reasons. First, Plaintiff does not seek to hold NRC
vicariously liable for Michalski's act of killing Phillips and second,
it is clear that at the time Michalski acted, he was no longer an NRC
employee and cannot be said to have been acting within the scope of
that former employment. Moreover, when "the employee commits an act
encompassing the use of force which is excessive and so dangerous as
to be totally without responsibility or reason, the employer is not
responsible as a matter of law." <u>Fitzgerald</u>, 410 A.2d at 1272.

least in part, by a purpose to serve the employer." In fact, accessing the databases for personal reasons was a direct violation of the employer's policies. As a result, NRC cannot be held liable for the events which occurred after Michalski accessed the confidential databases for his own purposes. *See* Joseph M. v. Northeastern Educ. Intermediate Unit 19, 516 F. Supp.2d 424, 446 (M.D. Pa. 2007), *quoting* McMaster v. Reale, 110 A.2d 831, 832 (Pa. Super. Ct. 1955) ("a master is not liable for the willful misconduct of his servant, and. . . such willful misconduct, while it may be within the course of the employment, is not within the scope thereof.") Moreover, the memorandum reprimanding Michalski for having done so on October 12, 2003, contained a provision that a second infraction would lead to his dismissal; this warning that was actually carried out on October 29, 2003, immediately after Nussbaum learned of Michalski's second unauthorized database access. Such an action refutes Plaintiff's argument that NRC deliberately and consciously indifferent to the improper activities of its employees.

Summary judgment is therefore granted to all Defendants on Count III.

    D.   Survival Action

        1. *Plaintiff's Claims:* In Count IV, Plaintiff brings a survival action against the same Defendants on behalf of Phillips's estate for damages recoverable under the Pennsylvania's Survival

Statute, 42 Pa. C.S.A. § 8302.   These damages include past and future loss of income and earning capacity, pain and suffering, physical injury, disfigurement and loss of life suffered by Mark Phillips.   The claim is again based on the above-described negligent actions by Defendants.   (Am. Comp., ¶¶ 63-65.)

   2.   *Applicable Law:*   Unlike a wrongful death action, a survival action is, in effect, a continuation by the decedent's estate of a personal injury action which could have been brought by the injured party himself had he survived.   *See* <u>Moyer v. Rubright</u>, 651 A.2d 1139, 1141 (Pa. Super. Ct. 1994); <u>Pastierik v. Duquesne Light Co.</u>, 526 A.2d 323, 326 (Pa. 1987).   "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."   42 Pa. C.S.A. § 8302.   The Pennsylvania Superior Court has made clear that

> [i]f a person is injured by the act of another, a cause of action may accrue to the injured person.   His or her death thereafter does not abate the cause of action. Pursuant to 42 Pa. C.S.A. § 8302, the cause of action survives the death of the injured person and continues in the decedent's personal representative.   The damages recoverable are measured by the pecuniary loss occasioned to the injured person, and therefore his or her estate, by the negligent act which caused death.

<u>Baumgart v. Keene Bldg. Prods. Corp.</u>, 633 A.2d 1189, 1191 (Pa. Super. Ct. 1993).

   Like a wrongful death claim, a survival action depends on a showing of negligence on the part of the defendant and the four elements required by Pennsylvania law set out in the previous

section.  *See* <u>Holbrook v. Woodham</u>, CA No. 05-304, 2008 U.S. Dist.
LEXIS 76268, *21-*22 (W.D. Pa. Sept. 30, 2008).  The failure to
establish any one of these elements is a ground for summary
judgment.  <u>Estate of Zimmerman v. SEPTA</u>, 168 F.3d 680, 684 (3d Cir.
1999).

>          3.  *Arguments, Analysis and Conclusion:*   The parties'
arguments are essentially the same as in the wrongful death claim
above.  Inasmuch as we have concluded that none of the individual
Defendants owed a duty to Plaintiff and, to the extent that any of
their actions may have been considered negligent, such negligence
was so remote that no proximate cause can be established, we
further conclude that Plaintiff's survival action must also fail.
Similarly, NRC cannot be held vicariously liable for the acts of
its employees or Michalski.  Summary judgment is therefore granted
in favor of Defendants as to Count IV of Plaintiff's Amended
Complaint.

**V.   CONCLUSION**

>     The deaths of Gretchen Ferderbar, Linda Ferderbar and Mark
Phillips were, as the Court of Appeals noted, "inescapably tragic."
<u>Phillips</u>, 515 F.3d at 228.  While we empathize with Plaintiff, we
are compelled to conclude, based on the record before us, that she
has failed to come forth with evidence which would support her
claims against Danielle Tush, Brian Craig, Daniel Nussbaum, or
their employer, Northwest Regional Communications Center.

Summary judgment is entered in favor of Defendants on all claims.  An appropriate Order follows.

October _27_ , 2009

William L. Standish
United States District Judge